TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




NO. 03-04-00611-CV




GJP, Inc.; Richard D. Herting; Classic Jaguar, Inc. and

Dan Mooney, Appellants


v.


Avijit Ghosh, Appellee




FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY

NO. 268,925, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING



O P I N I O N


 This appeal concerns a dispute arising from the purchase of a used 1967 Jaguar
sports car by appellee, Avijit Ghosh, from appellants GJP Inc. and Richard D. Herting. 
Complaining that he had been misled regarding the Jaguar's condition, Ghosh filed suit against
appellants and two other defendants, alleging violations of the Texas Deceptive Trade Practices
Act, among other claims. His claims were tried to a jury. Based on the jury's favorable findings
on Ghosh's DTPA claims, the trial court rendered judgment against all defendants, jointly and
severally, for $11,500 in actual damages and $112,500 in attorney's fees; $20,000 in additional
damages against appellants, jointly and severally, based on findings of knowing conduct; plus
another $3,000 in damages against GJP. Appellants bring twenty-seven points of error
challenging, among other things, the trial court's personal jurisdiction over them, its refusal to
apply South Dakota law, the jury charge, and the sufficiency of the evidence to support the jury's
findings regarding liability and actual damages. For the reasons explained herein, we will affirm
the judgment.


BACKGROUND

 According to the evidence presented at trial, GJP is a South Dakota-based
company principally engaged, at relevant times, in the plastering business. At pertinent times,
GJP was owned by Gerald Johnson, a South Dakota resident. (1) Johnson testified that the
company, in addition to its primary business focus, also held title to approximately a dozen
Jaguar automobiles. Johnson explained that acquiring and restoring Jaguars was a hobby of his
and that he found it "convenient" to place the cars' title in his company. Richard Herting, a
longtime friend of Johnson and fellow South Dakota resident, was an authorized agent of GJP
who handled various business dealings of the company. He also shared Johnson's interest and
work with his Jaguar collection. Appellants concede that, at all relevant times, Herting was
acting within his authority as an agent of GJP.

 Among the Jaguars in the collection was a red 1967 E-type Jaguar convertible. 
When purchased by GJP in 1999, this vehicle had been partially disassembled and was missing
bumpers, door handles, most of the interior, and parts of the engine. Johnson and Herting
reassembled it and, among other work, repainted it red, installed an interior and top, cleaned out
and "redid" the gas tank, got "most of the wiring to work," and installed new wheels and tires. 
Johnson explained that he later chose to resell the 1967 E-type because he was restoring a 1968
E-type and "just didn't need two of them"; he added that he had lost interest in the 1967 vehicle
once the "puzzle" of repairs had been completed. GJP had not previously sold one of its Jaguars,
and Johnson denied that he had purchased the car with the intent to resell it. At trial, Ghosh
questioned this explanation, suggesting that appellants had chosen to sell the car because they
were aware of problems with it.

 Herting advertised the red Jaguar on three websites around the world where, he
testified, such vehicles were sold or traded--eBay, based in California; Jag-Lovers, based in
Bergen, Norway; and Classic Jaguar, an Austin-based company that specialized in restorations of
E-type vehicles. Herting explained that he chose Classic Jaguar because it was well-known and
well-respected among Jaguar enthusiasts worldwide; there was also evidence that Herting and
GJP had previously purchased parts from Classic Jaguar for use in their restorations, including
the red Jaguar. Classic Jaguar is owned by Dan Mooney. Herting emailed information
regarding the car to Mooney, who crafted, and Herting approved, an advertisement that Mooney
placed on a portion of the Classic Jaguar website dedicated to similar "for sale" postings. The ad
displayed two photographs of the red E-type and stated, "Believed low mileage (30,000)
matching number car," "Strong mechanicals," and "New floors, sills, paint, interior (less seats),
windshield, wiring, brakes, suspension, tyres (2) and wheels." It listed an asking price of $38,000
and directed inquires to Herting's South Dakota telephone number, also providing Herting's
email address.

 In the meantime, Ghosh, a Houston resident, had been searching websites with an
interest in purchasing a used E-type Jaguar. Ghosh explained that since his boyhood in Great
Britain, he had harbored dreams of some day owning an E-type Jaguar and that these dreams had
been rekindled by his spotting an E-type at a Houston car wash. Ghosh began searching
websites. There was evidence that before purchasing the car at issue in this case, Ghosh
negotiated the purchase of a Jaguar on the East Coast and even had it inspected before the deal
fell through. Ghosh found the Classic Jaguar website, and inquired with Classic and Mooney
about a blue Jaguar featured in one of the site's "for sale" ads. During a discussion about the
blue car and the difficulty of finding reasonably priced E-types in general, Ghosh claims that
Mooney mentioned, "Well, actually, there's an excellent car on our website right now," and
referred him to appellants' ad for the red Jaguar.

 Ghosh testified that Mooney vouched for Herting's experience and capability as a
Jaguar restorer and his work on the red Jaguar in particular, indicating that Herting had used
parts purchased from Classic Jaguar. Relying on Mooney's remarks about Herting and the car,
Ghosh called Herting at his South Dakota phone number. The parties gave differing accounts of
ensuing events. Ghosh testified that he called Herting four to five times before the Jaguar came
to Texas. Herting testified that he received several calls from Ghosh, among a "few dozen" he
received inquiring about the car. Ghosh claimed that during their first call, Herting made various
representations echoing the statements in the website ad, explained the work he had done to the
car, (3) and stated that the car drove well and was in fine running order, (4) that it was "rust-free," and
that he had been storing the car in a heated garage. Ghosh claimed that he was impressed by
Herting's apparently extensive knowledge of Jaguars and the fact that he had maintained and
worked on so many other Jaguars in the GJP collection. Ghosh gained further confidence in
Herting, he testified, because Herting made apparently forthcoming acknowledgments that the
hood "didn't fit exactly right," the seats had not been replaced, and the right rear quarter of the
car was not original. After their first phone conversation, Herting emailed Ghosh approximately
twenty photographs of the red Jaguar. Ghosh added that, at some point, he inquired about
having the Jaguar inspected in South Dakota, but Herting had dissuaded him by claiming that
Ghosh would be unable to find an impartial opinion because all of the potential inspectors knew
him. Herting, by contrast, explained that while any potential South Dakota inspectors would
know him because he and Johnson had essentially the only Jaguar collection in the state, he had
suggested that Ghosh have the car inspected in a neighboring state.

 Ghosh called Herting and offered him a price of $35,000, $3,000 below the
asking price. Herting testified that Ghosh offered that price in exchange for taking the car "as-is" and without inspection. Both Herting and Johnson testified that it was not unusual in the
marketplace for buyers to purchase used Jaguars without inspection, and that they had previously
done so. Ghosh denies that he offered to purchase the car "as-is." He admits that he elected not
to have the car inspected, blaming Herting and Mooney for inducing him into such a high level
of confidence in the red Jaguar that he believed none was warranted.

 In response to Ghosh's offer, Herting indicated that he needed to consult with his
partner and asked Ghosh to call him back later. When Ghosh called, Herting accepted the offer
on behalf of GJP. The parties agreed that they would meet at Classic Jaguar in Austin to
conclude the transaction. It is undisputed that this location was chosen because Herting had
previously planned a trip to Austin with an empty trailer to pick up a race car GJP had purchased
from Classic Jaguar. Johnson and Herting added that these terms were part of the parties' deal: 
they claimed that Ghosh agreed to forego an inspection if Herting would deliver the car to Texas
at no charge.

 On the following morning, Ghosh sent the following email to Herting:




Richard

I wanted to say thanks to you and your partner on agreeing to the deal we
discussed by phone last night. As my very first E-Type this will be a boyhood
ambition realised.


When convenient perhaps you could let me know the VIN so I can organise
insurance etc. I am looking forward to meeting you at Dan's [Mooney's] Jaguar]
. . . I shall bring a certified cheque in favour of "G.J.P. Inc."





Similarly, Ghosh arranged with Mooney, in advance of his meeting with Herting, to have work
done on the red Jaguar, including a hood realignment and installation of seat belts. (5) He also
made plans to drive the car over the weekend (the agreed-upon meeting date was a Friday)
before returning the car to Classic on the following Monday to have the work performed. But
Ghosh, at trial, dismissed as "complete nonsense" the notion that he had agreed to purchase the
Jaguar while it was still in South Dakota. Instead, he characterized the parties' "deal" as being
limited only to the price Ghosh would pay if he decided to purchase the car upon seeing it in
Austin. According to Ghosh, "the car was being brought down to Texas for me to look at and
any deal that was going to be conducted was going to be conducted here."

 With what he testified was his understanding that he had a firm sale, Herting
loaded the red Jaguar on the empty trailer and, accompanied by his wife, drove to Austin. On
the appointed date, Ghosh arrived from Houston with a $35,000 cashier's check dated the
preceding day. He testified that he had already planned to spend the weekend driving the car in
the Hill Country with his girlfriend, who had accompanied him to Austin. Ghosh entered Classic
Jaguar, where he met Herting and Mooney in person, and walked outside to where the red Jaguar
was parked. Herting briefly pointed out various features of the work he had done to the car. 
Ghosh testified that he noticed a paint chip on the trunk and that the trunk did not appear flush
with the rest of the car when closed. Herting assured him that the effect was likely attributable
to new rubber seals that would eventually compress. Ghosh testified that he did not regard either
of these problems as sufficiently serious to deter him from purchasing the car, and that the car
looked to him as it had been represented. Ghosh and Herting then went inside the dealership.

 According to Mooney's testimony, he allowed Herting and Ghosh to use an
empty office in which to meet. Ghosh gave his cashier's check to Herting, and Herting handed
over the car's South Dakota title, repair and parts receipts, and keys. When they emerged from
the office after ten or fifteen minutes, Ghosh exclaimed, "Dan, I own my first E Type" and then
asked Mooney to "look at a couple of things on the car" for him. Specifically, Ghosh asked
whether the trunk lid needed to be adjusted and whether the floors were new. Although Mooney
glanced at some of these exterior features, he testified that his 30-second look at the car was by
no means an inspection, which, he explained, requires two to three hours to complete.

 Apparently satisfied with his purchase, Ghosh prepared for his planned Hill
Country excursion that evening. According to Mooney, he exclaimed to Ghosh, "You're out of
your mind." Mooney gave Ghosh the contact information for Pinkie's towing company, a
company experienced in loading Jaguars and trusted by Classic Jaguar. According to Mooney,
as he gave Ghosh the card, he said, "You're going to need them." Ghosh, by contrast, claims
that Mooney assured him he would be fine, but acknowledges that Mooney volunteered the
Pinkie's card.

 Approximately eight to ten miles into his Hill Country excursion, Ghosh
encountered what he perceived to be several problems with the car, including an overheating
engine and leaking fluids. He ultimately had the car towed back to Classic Jaguar. Ghosh
requested Classic Jaguar to inspect the car. The eventual inspection revealed, among other
problems, cracks and other structural weaknesses in the engine frames--which, Johnson
admitted at trial, created a danger to the driver--a blown head gasket, missing bolts, oil and
water leaks, and corrosion.

 Ghosh eventually filed suit in the trial court against GJP, Herting, Mooney, and
Classic Jaguar. Appellants entered special appearances to contest personal jurisdiction, which
the trial court denied. Appellants did not pursue the interlocutory appeal permitted by section
51.014(a)(7) of the civil practice and remedies code, (6) but proceeded to trial along with the other
defendants. The trial court submitted against all defendants liability theories under the DTPA
("laundry list" violations and unconscionability), whether such conduct was committed
knowingly, fraud, and malice. The trial court also inquired as to the amount of actual damages
(under a benefit-of-the-bargain measure) and exemplary damages. As to appellants, the jury
found in Ghosh's favor on all liability issues. (7) The jury awarded $11,500 in actual damages,
plus $20,000 in additional damages against Herting and $40,000 against GJP. (8) Based on the
jury's findings, the trial court rendered judgment against all defendants, jointly and severally, for
$11,500 in actual damages and $112,500 in attorney's fees; $20,000 in additional damages
against appellants, jointly and severally, for knowing DTPA violations; plus another $3,000 in
additional damages against GJP. After appellants' motions for j.n.o.v. and to disregard findings
were overruled, they appealed. (9)


DISCUSSION

 Appellants bring twenty-seven points of error, which can be categorized as: (1)
challenges to the trial court's denial of their special appearances (10); (2) a choice-of-law
complaint (11); (3) complaints of charge error (12); and (4) evidentiary-sufficiency challenges to the
jury's findings on liability, knowing conduct under the DTPA, and the amount of actual
damages. (13) In a final point of error, appellants complain that the attorney's fee award is
erroneous because the underlying judgment is. (14)


Personal jurisdiction

 In their first through fourth points of error, appellants contend the trial court erred
in overruling their special appearances, urging there is legally and factually insufficient evidence
of any facts that would support the trial court's assertion of personal jurisdiction over them.


 Appellate jurisdiction

 Ghosh does not question that we have jurisdiction to consider appellants' issues
challenging the trial court's denial of their special appearances. We observe that a recent
decision of one of sister courts has raised questions regarding appellate court jurisdiction over
appeals from denials of special appearances where, as here, the appellant does not take an
interlocutory appeal from the denial of its special appearances but opts instead to raise the issue
in its appeal from the final judgment following trial. See Matis v. Golden, 228 S.W.3d 301, 305
(Tex. App.--Waco 2007, no pet.) (holding that an interlocutory appeal under section
51.014(a)(7) of the civil practice and remedies code is the exclusive means of challenging the
denial of a special appearance and must be brought within the deadlines governing interlocutory
appeals); see id. at 312 (Gray, C.J., concurring) (emphasizing that this "holding means the losing
party cannot wait until the end of the proceeding and then appeal the denial of the special
appearance, but must instead comply with the requisites of timely filing a notice of appeal for the
accelerated appeal.").

 Subject-matter jurisdiction cannot be waived or conferred by agreement and can
be raised by the court sua sponte for the first time on appeal. See Reata Constr. Corp. v. City of
Dallas, 197 S.W.3d 371, 379 (Tex. 2006); M.O. Dental Lab v. Rape, 139 S.W.3d 671, 673 (Tex.
2004). Because we respectfully disagree with our sister court that appellate jurisdiction to
review special appearance rulings is limited solely to that which the legislature has conferred in
section 51.014(a)(7), see Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2007),
we decline to adopt the reasoning in Matis. (15) For the same reasons, the deadlines that govern
interlocutory appeals, see Tex. R. App. P. 26.1(b), 28.1, are simply irrelevant here. Cf. Matis,
228 S.W.3d at 305 (relying on cases involving untimely appeals of still-interlocutory orders). 
We conclude that we have jurisdiction to consider appellants' issues regarding the trial court's
denial of their special appearances and turn to them now.


 General principles

 A court must possess personal jurisdiction over a party in order to issue a binding
judgment against it. CSR, Ltd. v. Link, 925 S.W.2d 591, 594 (Tex. 1996). Texas courts may
assert personal jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the
exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with constitutional due-process guarantees. Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex. 2007)
(citing Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 1990)).

 The Texas long-arm statute authorizes service of process on nonresidents "[i]n an
action arising from the nonresident's business in the state." Tex. Civ. Prac. & Rem. Code Ann. §
17.043 (West 1997). "In addition to other acts that may constitute doing business," a
nonresident "does business" in Texas if it (1) "contracts by mail or otherwise with a Texas
resident and either party is to perform the contract in whole or in part in this state"; or (2)
"commits a tort in whole or in part in this state." Id. § 17.042(1), (2). The Texas Supreme Court
has stated that the long-arm statute's broad "doing-business" language allows the statute to
"reach as far as the federal constitutional requirements of due process will allow." Moki Mac,
221 S.W.3d at 575 (quoting Guardian Royal Exch. Assurance, Ltd. v. English China Clays,
P.L.C., 815 S.W.2d 221, 226 (Tex. 1991)); see also Schlobohm, 784 S.W.2d at 357; U-Anchor
Adver., Inc. v. Burt, 553 S.W.2d 760, 762 (Tex. 1977). Consequently, in many cases, the
analysis of whether a Texas court may assert personal jurisdiction over a nonresident collapses
into the single inquiry of whether jurisdiction comports with federal due-process limitations. 
Moki Mac, 221 S.W.3d at 575. Appellants do not dispute that Ghosh's claims fall within the
literal language of the long-arm statute, but instead contend that the trial court's assertion of
personal jurisdiction over them violated due process.

 Like other due process inquiries, jurisdictional due process is ultimately
concerned with the reasonableness of a state's assertion of power over an individual, in light of a
balancing between individual liberty interests (here, not being forced against one's will to
litigate in a faraway or unduly burdensome forum) and state sovereign interests (its sovereign
power to try cases brought in its courts). See World-Wide Volkswagen Corp. v. Woodson, 444
U.S. 286, 291-94 (1980). Due process requires "fair warning that a particular activity may
subject them to the jurisdiction of a foreign sovereign," thereby assuring "a degree of
predictability to the legal system that allows potential defendants to structure their primary
conduct with some minimum assurance as to where that conduct will and will not render them
liable to suit." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quotations omitted). 
This requirement is frequently stated in terms of the "foreseeability that the defendant's conduct
and connections to the forum State are such that he should reasonably anticipate being haled into
court there." Woodson, 444 U.S. at 297; see American Type Culture Collection v. Coleman, 83
S.W.3d 801, 806 (Tex. 2002) ("The defendant's activities, whether they consist of direct acts
within Texas or conduct outside Texas, must justify a conclusion that the defendant could
reasonably anticipate being called into a Texas court.").

 This overarching reasonableness inquiry has been refined into a two-part test: the
assertion of jurisdiction over an out-of-state defendant who does not consent comports with due
process when the defendant has established "minimum contacts" with Texas and the exercise of
jurisdiction is consistent with "traditional notions of fair play and substantial justice." Moki
Mac, 221 S.W.3d at 575 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316
(1945)). We are to consider first whether the defendant has established "minimum contacts"
with Texas; if that threshold is met, we then consider whether the assertion of jurisdiction
comports with fair play and substantial justice. See BMC Software Belgium, N.V. v. Marchland,
83 S.W.3d 789, 795 (Tex. 2002).

 "Minimum-contacts analysis," the Texas Supreme Court has explained, "focuses
solely on the actions and reasonable expectations of the defendant." Michiana Easy Livin'
Country, Inc. v. Holten, 168 S.W.3d 777, 790 (Tex. 2005). Minimum contacts exist when the
nonresident defendant "purposefully avails itself of the privilege of conducting activities within
the forum State, thus invoking the benefits and protections of its laws." Moki Mac, 221 S.W.3d
at 575 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)); see Michiana, 168 S.W.3d at 784
("For half a century, the touchstone of jurisdictional due process has been 'purposeful
availment.'").

 When considering whether a defendant has "purposefully availed" itself of "the
privilege of conducting activities" in Texas so as to "invoke the benefits and protections of its
laws," only the defendant's contacts with the forum are relevant, not the unilateral activity of
another party or third person. Moki Mac, 221 S.W.3d at 575; Michiana, 168 S.W.3d at 785. 
Thus, in this case, we look only to the actions of appellants to determine if they have
purposefully availed themselves of Texas, not the actions of Ghosh or third parties like Dan
Mooney (absent some basis for imputing Mooney's actions to appellants, and Ghosh has
asserted none).

 Similarly, the defendant's contacts with the forum "must be purposeful rather
than fortuitous." Id. at 785 (emphasis added). Thus, "[s]ellers who 'reach out beyond one state
and create continuing relationships and obligations with citizens of another state' are subject to
the latter in suits based on their activities," id. (quoting Burger King, 471 U.S. at 475), while "a
defendant will not be haled into a jurisdiction solely based on contacts that are 'random, isolated,
or fortuitous.'" Id. (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)).

 Additionally, the defendant "must seek some benefit, advantage, or profit by
'availing' itself of the jurisdiction." Id. at 785 (emphasis added). Personal jurisdiction, the
Texas Supreme Court has stated, "is premised on notions of implied consent"--"that by
invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." Id.
(citing Woodson, 444 U.S. at 297). "By contrast, a nonresident may purposefully avoid a
particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws
nor be subject to its jurisdiction." Id. (citing Burger King, 471 U.S. at 473). The bare fact that a
defendant receives some benefit, advantage, or profit from Texas does not necessarily mean that
it has purposefully availed itself of the state. Id. at 788 ("financial benefits accruing to the
defendant from a collateral relation to the forum state will not support jurisdiction if they do not
stem from a constitutionally cognizable contact with the state.").

 "It is the quality and nature of the defendant's contacts, rather than their number,
that is important to the minimum contacts analysis." American Type Culture Collection, 83
S.W.3d at 806. The United States Supreme Court has further emphasized that minimum-contacts analysis does not turn on "mechanical tests." Burger King, 471 U.S. at 478 (quoting
International Shoe Corp., 326 U.S. at 319). In the commercial arena, the court has similarly
rejected "conceptualistic . . . theories of the place of contracting or of performance." Id. at 478-79 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316 (1943)). Instead, we are to
apply a "'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an
intermediate step serving to tie up prior business negotiations with future consequences which
themselves are the real object of the business transaction.'" Id. at 479 (quoting Hoopeston
Canning Co., 318 U.S. at 316). "It is these factors--prior negotiations and contemplated future
consequences, along with the terms of the contract and the parties' actual course of dealing--that
must be evaluated in determining whether the defendant purposefully established minimum
contacts with the forum." Id.

 A nonresident's forum-state contacts may give rise to two bases of personal
jurisdiction, "general" and "specific." General jurisdiction is established if the nonresident has
made "continuous and systematic" contacts with the forum, and does not depend on whether the
defendant's alleged liability arises from those contacts. Moki Mac, 221 S.W.3d at 575. Specific
jurisdiction is established if the defendant's alleged liability "aris[es] out of or [is] related to" an
activity conducted within the forum." Id. at 576 (quoting Helicopteros Nacionales de Columbia
v. Hall, 466 U.S. 408, 414 (1984)). When specific jurisdiction is alleged, the minimum-contacts
analysis is focused on the "relationship among the defendant, the forum[,] and the litigation." Id.
at 575-76 (quoting Guardian Royal, 815 S.W.2d at 228 (quoting Helicopteros, 466 U.S. at 414)). 
The Texas Supreme Court recently clarified the proper standard for determining this
"relatedness" aspect of specific jurisdiction-minimum contacts: "for a nonresident defendant's
forum contacts to support an exercise of specific jurisdiction, there must be a substantial
connection between those contacts and the operative facts of the litigation." Id. at 585.


 Standard and scope of review

 As plaintiff, Ghosh bore the initial burden of pleading sufficient facts to invoke
personal jurisdiction over appellants under the Texas long-arm statute. Moki Mac, 221 S.W.3d
at 574 (citing American Type Culture Collection, 83 S.W.3d at 807). Appellants then had the
burden of negating all forms of personal jurisdiction that Ghosh alleged. Id. (citing BMC
Software, 83 S.W.3d at 793). A trial court's determination of whether Texas can assert personal
jurisdiction over a nonresident defendant is one of law that we review de novo. Id. However,
the trial court frequently must decide disputed issues of fact before deciding the jurisdictional
issue. BMC Software Belgium, N.V., 83 S.W.3d at 794. Where, as here, the trial court does not
enter express findings of fact and conclusions of law regarding its ruling on a special
appearance, the reviewing court infers all fact findings necessary to support the judgment that
are supported by the evidence. Id. at 794-95. (16) These implied findings may be challenged for
legal and factual sufficiency. Id. Once it is determined that the trial court's findings are
supported by sufficient evidence or, if the material facts are undisputed, the reviewing court
decides as a matter of law whether those facts negate all bases for personal jurisdiction. Id.

 Under our legal sufficiency standard of review, we view the evidence in the light
most favorable to the challenged finding and indulge every reasonable inference that would
support it. City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable
evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable
fact-finder could not. Id. at 827. There is legally insufficient evidence or "no evidence" of a
vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred
by rules of law or of evidence from giving weight to the only evidence offered to prove a vital
fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the
evidence conclusively establishes the opposite of the vital fact. Merrell Dow Pharms., Inc. v.
Havner, 953 S.W.2d 706, 711 (Tex. 1997). More than a scintilla of evidence exists to support a
finding if the evidence would allow reasonable and fair-minded people to differ in their
conclusions. Id.

 In reviewing the factual sufficiency of the evidence, we consider and weigh all of
the evidence in the record, and we may overturn a judgment only if it is so against the great
weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986); Dyson v. Olin Corp., 692 S.W.2d 456, 457 (Tex. 1985).

 The scope of our review includes all evidence before the trial court on the issue of
personal jurisdiction. Hotel Partners v. Craig, 993 S.W.2d 116, 121 (Tex. App.--Dallas 1994,
pet. denied) ("In determining whether [defendants] carried their burden" of negating all bases of
personal jurisdiction, "we review all the evidence that was before the trial court."); Carbonit
Houston, Inc. v. Exch. Bank, 628 S.W.2d 826, 829 (Tex. App.--Houston [14th Dist.] 1982, writ
ref'd n.r.e.) ("[I]t is the duty of this court to review all of the evidence before the trial court on
the question of jurisdiction."). At the time of its hearing on appellants' special appearances, the
sole evidence before the trial court were affidavits filed by the parties and attached exhibits. The
parties did not present additional evidence during the hearing. (17) After the trial court denied
appellants relief, as noted, they could have, but did not, take an interlocutory appeal from that
ruling. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7). They instead proceeded to jury
trial and raised their jurisdictional challenge in their appeal from the final judgment. In that
procedural posture, appellants acknowledge that our scope of review includes not only the
evidence before the trial court when it ruled on their special appearances, but also all evidence
adduced at trial. See Bellair, Inc. v. Aviall of Texas, Inc., 819 S.W.2d 895, 898 (Tex.
App.--Dallas 1994, writ denied) (equating a special appearance to a venue challenge and
explaining that in determining such a challenge, the court must consider the entire record,
"including the evidence adduced at the trial on the merits.").


Purposeful availment

 It is undisputed that both Herting and GJP are South Dakota residents, that neither
maintains a place of business in Texas or has employees, servants, or agents within the state, and
that neither is required to maintain nor maintains a registered agent for service in Texas. The
evidence is also not disputed that the only business Herting or GJP had previously transacted in
Texas was purchasing parts by mail from Classic Jaguar and purchasing a race car on eBay that
Classic had advertised for sale on that site. Ghosh concedes that appellants' forum contacts do
not give rise to general jurisdiction over appellants. The parties instead join issue as to whether
specific jurisdiction arises from Herting's acts in connection with the sale of the red Jaguar to
Ghosh.

 Appellants equate the underlying facts to those of the Texas Supreme Court's
seminal decision in Michiana Easy Livin' Country, Inc. v. Holten. 168 S.W.3d 777. In
Michiana, the court addressed "whether suit can be brought in Texas based on a nonresident's
alleged misrepresentations in a telephone call with a Texas resident." Id. at 784. Holten was a
Texas resident. Michiana was a "factory outlet" that sold Coachman RVs at a location in
Indiana. Michiana had neither employees nor property in Texas, and was not authorized to do
business here. The court further observed that Michiana "does not advertise in Texas or on the
Internet, and thus did not solicit business from Holten or anyone else in Texas." Id. Holten,
desiring to purchase a Coachman RV at a lower price than that available from Coachman dealers
in Texas, inquired with the Coachman factory and, through it, learned of the Michiana factory
outlet and obtained its phone number. Holten called Michiana, and entered into an agreement to
purchase a Coachman RV. He sent payment to Indiana and took delivery in Texas, paying for
delivery himself. Dissatisfied with his RV, Holten subsequently sued Michiana in Texas,
alleging misrepresentations by the company during the phone call. The Texas Supreme Court
held that Michiana lacked minimum contacts with Texas because it had not purposefully availed
itself of the privilege of conducting activities here.

 Although acknowledging that "a nonresident that directs marketing efforts to
Texas in the hope of soliciting sales is subject to suit here in disputes arising from that business,"
the Texas Supreme Court emphasized that "[b]oth the United States Supreme Court and this
Court have found no purposeful availment in cases involving isolated sales by consumers who
proposed to use the product in a state where the defendant did no business." Id. at 785, 786. It
analogized the case to World-Wide Volkswagen, in which the United States Supreme Court held
that a New York car dealer who did not advertise or do business in Oklahoma could not be sued
in that state just because one of its buyers was involved in a collision there. Id. at 787. The
Texas Supreme Court reasoned:




The facts here are not the same as those in Woodson, but do not differ in any
material respect. Michiana knew Holten would take his RV to Texas, while it
was merely foreseeable to the defendant in Woodson that its buyer would drive
his Audi to Oklahoma. But in either case the choice was entirely that of the
purchaser; the seller had no say in the matter. Under Holten's theory, Michiana
could be sued in any state or country from which he chose to place his call and
take delivery. But as the Supreme Court stated, "unilateral activity . . . cannot
satisfy the requirement of contact with the forum State."




Id. (quoting World-Wide Volkswagen, 444 U.S. at 298). The court also relied upon its earlier
decision in CMMC v. Salinas, 929 S.W.2d 435, 437-40 (Tex. 1996), in which it had held that due
process prohibited specific jurisdiction in Texas for a personal injury suit arising from winepress
equipment sold by a French company to a Texas winery. The French company had "made no
effort to market its winepress equipment in Texas" (although the company's independent
distributor had run ads for CMMC products in national publications circulated to Texas), "had
made only one other sale in Texas," and did not initiate the sale to the Texas buyer. Michiana,
168 S.W.3d at 787; see CMMC, 929 S.W.2d at 436-37, 439.

 In its subsequent Moki Mac decision, the Texas Supreme Court further illustrated
these principles in distinguishing Michiana and CMMC from a Utah-based outdoor expedition
company that had actively solicited Texas business by mailing solicitations to past and
prospective customers, placing ads in local media, engaging in "mass and targeted direct-marketing email campaigns," and utilizing continuing relationships with customers to recruit
additional business. 221 S.W.3d at 577-79. It contrasted Michiana--a "seller [who] did not
purposefully direct marketing efforts here to solicit sales" yet sold an RV to Holten in Texas "by
the mere fortuity that Holten happened to reside here"--with Moki Mac, "[a] nonresident
defendant that directs marketing efforts to Texas in the hope of soliciting sales," who would be
"subject to suit here for alleged liability arising from or relating to that business." Id. at 576.

 In light of these principles, the Texas Supreme Court emphasized in Michiana,
the bare fact that a nonresident defendant makes a sale to a Texas buyer does not constitute
purposeful availment to the privilege of conducting activities in Texas so as to invoke the
benefits and protections of its laws. Michiana, 168 S.W.3d at 786-87; see Moki Mac, 221
S.W.3d at 577 ("the mere sale of a product to a Texas resident will not generally suffice to
confer specific jurisdiction upon our courts. Instead, the facts alleged must indicate that the
seller intended to serve the Texas market."); see also Michiana, 168 S.W.3d at 788 n.59
(emphasizing that its precedents "should not be read to extend stream-of-commerce jurisdiction
to a single sale"). The court similarly observed that, "the United States Supreme Court has
emphatically answered the question whether a single contract with a Texas resident can
automatically establish jurisdiction--'the answer clearly is that it cannot.'" Michiana, 168
S.W.3d at 786 (quoting Burger King, 471 U.S. at 475 n.18, 478). Although the court
acknowledged that "in some circumstances a single contract may meet the purposeful-availment
standard," that is not the case "when it involves a single contact taking place outside the forum
state." Id. The court contrasted the single product sale at issue with long-term franchise
agreements, see Burger King, 471 U.S. at 478-82, and life-insurance policies, see McGee v. Int'l
Life Ins. Co., 355 U.S. 220, 223 (1957), which it deemed capable of constituting minimum
contacts because they entail "many contacts over a long period of time." Michiana, 168 S.W.3d
at 787.

 The Texas Supreme Court further contrasted purposeful availment to "the benefits
and protections of the laws" with the mere realization of "financial benefits accruing to the
defendant from a collateral relation with the forum state [that] do not stem from a
constitutionally cognizable contact." Id. at 787-88. It suggested that "it is hard to imagine what
possible benefits and protections Michiana enjoyed from Texas law. Holten paid for the RV in
advance and could not have planned on taking it to Indiana regularly for service. Everything
Michiana wanted out of the contract it had in hand." Id. at 787. "Indeed," the court posited, "it
is hard to imagine how Michiana would have conducted its activities any differently had Texas
had no law at all." Id.

 The supreme court also held that two other acts by Michiana did not constitute
purposeful availment: (1) Michiana's arrangement with a shipper to deliver the RV to Holten for
use in Texas, and (2) Michiana's alleged misrepresentations during the phone call. Regarding
shipping, the court observed that "[d]elivery was at Holten's sole request and sole expense," and
added, "If a seller of chattels is subject to suit wherever a customer requests delivery, then the
chattel has become its agent for service of process - a conclusion that the United States Supreme
Court has expressly rejected." Id. at 788 (citing World-Wide Volkswagen, 444 U.S. at 296). It
relied on its holding in CMMC that due process prohibited a state court from taking "personal
jurisdiction over a foreign manufacturer merely because it knew its allegedly defective product
would be shipped to that state." Id. (quoting CMMC, 929 S.W.2d at 436). Notably, the French
manufacturer in CMMC had shipped its product to the Texas buyer F.O.B. Houston--i.e.,
CMMC tendered delivery of the product in Texas and title passed there (18)--but neither the
CMMC nor Michiana courts seemed to regard this act as constituting purposeful availment to the
benefits and protections of Texas law. See id.; CMMC, 929 S.W.2d at 437-40; cf. American
Type Culture Collection, 83 S.W.3d at 808 (fact that goods were delivered F.O.B. to an out-of-state location as significant factor in finding no general jurisdiction) (citing Bearry v. Beech
Aircraft Corp., 818 F.2d 370, 375-76 (5th Cir. 1987)).

 As for Michiana's alleged misrepresentations during the phone call from Holten,
the Texas Supreme Court squarely rejected the notion that personal jurisdiction comported with
due process when asserted on the sole basis that "a tortfeasor knows that the brunt of the injury
will be felt by a particular resident in the forum state." Michiana, 168 S.W.3d at 788-89
(terming the theory "committing a tort 'in' Texas" and "directed-a-tort jurisdiction"). (19) Instead,
the court reasoned, the defendant's underlying acts--its "conduct and connection to the
forum"--must constitute purposeful availment apart from whether or not those acts gave rise to
tort liability. Id. And, the act of "a single unsolicited phone call a nonresident answered from a
single private individual in the forum state," the court emphasized, did not constitute purposeful
availment. Id. at 788-90 (distinguishing tort in phone calls from those arising from the
publications of thousands of allegedly defamatory articles in the forum state and "conduct . . .
aimed at getting extensive business in or from the forum state"). (20)

 Appellants urge that Michiana compels us to hold they did not purposefully avail
themselves to the privilege of doing business in Texas so as to invoke the benefits and
protections of its laws. Ghosh, like Holten, sued appellants based on misrepresentations
allegedly made from out of state during one or more telephone calls. Each of these phone calls,
Herting testified without dispute, was initiated by Ghosh. The mere allegation or proof that
Ghosh relied on these out-of-state representations in Texas cannot support jurisdiction,
appellants contend, nor are these phone calls proof of purposeful availment. See Michiana, 168
S.W.3d at 788-92. Appellants add that there is no evidence they purposefully solicited Ghosh's
business in a manner that could give rise to specific jurisdiction. To the contrary, they
emphasize Ghosh's admissions that he had learned about Herting and the Jaguar from Mooney (a
third party) and called Herting in reliance on Mooney's vouching for both the car and Herting's
work. See Michiana, 168 S.W.3d at 785 (only defendant's acts count in determining whether it
purposefully availed itself to the forum). Consequently, appellants maintain, the only Texas
connection between the phone conversations and the parties' ultimate "deal" was that Ghosh
happened to live in Texas. See Moki Mac, 221 S.W.3d at 576.

 Unlike Michiana, appellants did advertise on the Internet. Cf. Michiana, 168
S.W.3d at 784 (noting that Michiana "does not advertise in Texas or on the Internet, and thus did
not solicit business from Holten or anyone else in Texas."). Nonetheless, they point out that
under the "Texas law on Internet activities" recognized in Michiana, a mere "passive" website
advertisement--one that does not permit interactivity--does not constitute purposeful availment
to the viewer's forum. (21) Appellants emphasize that Herting's ad consisted only of photographs and statements, listed an asking price of $38,000, and directed inquires to Herting's South
Dakota telephone number and email address, but did not enable a viewer to interact online with
Herting. See Mink v. AAAA Dev. LLC, 190 F.3d 333, 336 (5th Cir. 1999). The fact that the
owner of the website was Austin-based Classic Jaguar, appellants further assert, does not
distinguish their passive website advertisement from one posted anywhere else in the world. 
Appellants stress that Herting posted similar ads on two other websites around the world that
were calculated to reach Jaguar enthusiasts worldwide--Jag-Lovers, based in Bergen, Norway
and eBay, located in California. The Classic Jaguar website was included among these, Herting
testified without dispute, not because of its geographic location but because it, like the other two
sites, was well-known and well-respected within the global community of Jaguar enthusiasts. (22) 
Cf. Moki Mac, 221 S.W.3d at 577-78 ("a nonresident defendant's advertising in local media 'in
and of itself, is a sufficiently purposeful act that is done in Texas.'") (quoting Siskind v. Villa
Found. for Educ., Inc., 642 S.W.2d 434, 436 (Tex. 1982)); with CMMC, 929 S.W.2d at 440
(finding no purposeful availment where only marketing efforts to Texas consisted of ads run in
national publications having Texas subscribers). As for Herting's conduct in Texas,
appellants dismiss it as akin to Michiana's shipping the RV to Holten in Texas. See Michiana,
168 S.W.3d at 788 ("If a seller of chattels is subject to suit wherever a customer requests
delivery, then the chattel has become its agent for service of process--a conclusion the United
States Supreme Court has expressly rejected.") (citing World-Wide Volkswagen, 444 U.S. at
296)); see also CMMC, 929 S.W.2d at 437-40 (finding no personal jurisdiction over
manufacturer that knew a machine it sold a Texas buyer was being shipped here F.O.B.
Houston). In appellants' view, they executed a sale contract with Ghosh before the Jaguar ever
left South Dakota and were merely performing under that agreement while in Texas. Michiana,
168 S.W.3d at 787 (mere existence of a contract with a forum resident does not constitute
purposeful availment). The fact that performance took place in Texas as opposed to South
Dakota or somewhere else, appellants add, stems from the fortuities that (1) Herting had already
made plans to travel to Classic Jaguar with a trailer to pick up the race car appellants had
purchased; and (2) that location also happened to be convenient to Ghosh, who lived in Houston
and desired to have Classic work on the car. Appellants add that Herting's trip to Texas did not
seek or obtain benefits or protections from Texas law, but merely provided a courtesy to Ghosh
that saved him the costs and inconvenience of having to make separate shipping and payment
arrangements to gain possession of the car.

 Although attributing somewhat greater jurisdictional significance to appellants'
advertisement on the Classic Jaguar website and his telephone conversations with Herting,
Ghosh acknowledges that personal jurisdiction ultimately hinges on the implications of Herting's
acts while physically present in Texas. (23) He urges that Herting availed himself of the benefits
and protections of Texas law by traveling to Texas and selling him the Jaguar here. As noted,
Ghosh disputes appellants' view of the "deal" they struck by telephone as "complete nonsense,"
claiming that he had agreed only to a price of $35,000 if he decided to purchase the car after
seeing it in Austin and that "any deal that was going to be conducted was going to be conducted
here." In the alternative, Ghosh argues that if the parties had executed a sale contract by phone,
appellants purposefully availed themselves to Texas by agreeing to deliver the car and accept
payment here. See Ball v. Bigham, 990 S.W.2d 343, 348 (Tex. App.--Amarillo 1999, no pet.)
(nonresident purposefully availed himself of Texas when executing Kansas sale contract and
accepting payment in consideration of his promise to deliver engine to Texas and assist in its
installation).

 Assuming without deciding that the "deal" the parties struck by telephone
constituted a contract for sale, as appellants contend, we nonetheless conclude that Herting's acts
in Texas constituted purposeful availment of the privilege of conducting activities in Texas so as
to invoke the benefits and protections of Texas law. To understand why, we first consider the
nature of the duties that Herting would have assumed under this sale contract. Both Texas and
South Dakota have adopted the Uniform Commercial Code, and the applicable provisions of
each state's version are materially identical. It is undisputed that Herting agreed to deliver the
Jaguar to Ghosh in Austin. Upon tender of delivery in Austin, title would pass to Ghosh. See
Tex. Bus. & Com. Code Ann. §§ 2.401(b), 2.503; S.D. Codified Laws §§ 57A-2-401(2), 57A-2-503 (2004). Tender of delivery was a condition to Ghosh's duty to accept the Jaguar and, unless
otherwise agreed, to pay for it. See Tex. Bus. & Com. Code Ann. § 2.507(a) (West 1994); S.D.
Codified Laws § 57A-2-507(1) (2004). Conversely, unless otherwise agreed, Ghosh's tender of
payment was a condition to Herting's duty to tender and complete delivery. See Tex. Bus. &
Com. Code Ann. § 2.511(a) (West 1994); S.D. Codified Laws § 57A-2-511(1) (2004). Here, it is
undisputed that Herting had agreed to accept payment from Ghosh upon his delivery of the
Jaguar in Austin.

 The obligation to tender delivery required Herting to place at Ghosh's disposal a
Jaguar conforming to their sale agreement. See Tex. Bus. & Com. Code Ann. §§ 2.201, 2.313
(West 1994), § 2.503(a); S.D. Codified Laws §§ 57A-2-201, 57A-2-313, 57A-2-503(1) (2004). 
Ghosh had the right to reject the Jaguar if it did not conform to the sale contract. See Tex. Bus.
& Com. Code Ann. §§ 2.508(a), 2.510(a), 2.601, 2.602 (West 1994); S.D. Codified Laws §§
57A-2-508(1), 57A-2-510(1), 57A-2-601, 57A-2-602 (2004). The U.C.C. also entitled Ghosh to
inspect the car before payment or acceptance. See Tex. Bus. & Com. Code Ann. § 2.513 (West
1994); S.D. Codified Laws § 57A-2-513 (2004). Ghosh accepted the Jaguar and paid Herting. 
See Tex. Bus. & Com. Code Ann. § 2.606 (West 1994); S.D. Codified Laws § 57A-2-606
(2004).

 We consider whether Herting's agreement to undertake these acts in Texas and
his subsequent performance constitutes purposeful availment under the principles identified in
Michiana and CMMC. The mere fact that Herting executed a sale contract with Ghosh would
not suffice. See Michiana, 168 S.W.3d at 786 (quoting Burger King, 471 U.S. at 475 n.18, 478). 
Nor would it appear, especially under CMMC, that Herting's tender of delivery in Texas and
transfer of title here is alone sufficient to support personal jurisdiction. See id. at 788 ("If a
seller of chattels is subject to suit wherever a customer requests delivery, then the chattel has
become its agent for service of process . . . ."); CMMC, 929 S.W.2d at 437-40.

 For the same reasons, the fact that Herting personally delivered the Jaguar would
not necessarily distinguish these facts from those of CMMC, as the third-party shipper there was
acting as the French company's agent when delivering the winepress equipment and transferring
title in Texas. See id. More generally, territorial presence can be a key factor tending to enhance
a potential defendant's affiliation with a state and demonstrating the purposefulness of the
contact, Burger King, 471 U.S. at 476, but Michiana makes clear that the bare fact of physical
presence in a state does not necessarily equal purposeful availment. The Michiana court cited
with approval a court of appeals decision that Texas had no personal jurisdiction over a
nonresident shipowner whose agent had assaulted and denied wages to seamen while their ship
was physically present in a Texas port. See id. at 788 n.62 (citing with approval Antonio v.
Marino, 910 S.W.2d 624, 627-28 (Tex. App.--Houston [14th Dist.] 1995, no writ)). Although
commission of a tort while physically present in the forum state is a well-established basis for
personal jurisdiction, (24) the court of appeals had reasoned that the shipowner had not purposefully
availed itself of Texas because the ship's location when the torts allegedly occurred had been
determined by its chartering company. See Antonio, 910 S.W.2d at 627-28 (noting that ship "has
no regular schedule of ports at which it calls, but follows the schedule of the [third-party]
charterer"); Michiana, 168 S.W.3d at 788 n.62 (citing Antonio for proposition that "nonresident
shipowner whose agent assaulted and denied wages to seamen in Texas port had not
purposefully availed itself of Texas because ship's location was fortuitous."); see also American
Type Culture Collection, 83 S.W.3d at 806 ("The defendant's activities, whether they constitute
direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant
could reasonably anticipate being called into a Texas court.") (emphasis added).

 On the other hand, there are factual distinctions between the actions Herting
agreed to perform here and those of the sellers in Michiana and CMMC. In neither of those
cases did the seller pay for delivery: In Michiana, the supreme court emphasized that Holten
paid for delivery himself, see Michiana, 168 S.W.3d at 788 ("[d]elivery in Texas was at Holten's
sole request and sole expense."), whereas in CMMC, shipment was paid for by the French
company's independent distributor through whom the Texas company had placed its order. 
CMMC, 929 S.W.2d at 436 (noting that distributor, KLR, had "instructed CMMC to arrange
with A. Germaine, a freight forwarder paid by KLR, to transport the press from CMMC's factory
in Chalonnes, France, to the ship on which it would travel to the United States"). Herting, by
contrast, delivered the Jaguar to Texas at his sole expense. Additionally, the parties agreed that
payment would be made upon delivery of the Jaguar in Austin. In Michiana, in regard to
whether the company had availed itself to the benefits and protections of Texas law, the Texas
Supreme Court emphasized that "Holten paid for the RV in advance, and . . . [e]verything
Michiana wanted out of the contract it had in hand." Michiana, 168 S.W.3d at 787. (25)

 In sum, assuming appellants' characterization of the "deal" struck by phone as a
contract for sale of the Jaguar, the contract provided that the entire sale was to be performed in
Texas. See Tex. Bus. & Com. Code Ann. § 2.106(a) (a "sale" consists in the passing of title
from the seller to the buyer for a price); S.D. Codified Laws § 57A-2-106(1) (2004) (same). In
this way, the transaction was directed to Texas to a degree that those in Michiana and CMMC
were not.

 We cannot agree with appellants that Herting's physical presence in Texas when
closing the sale is "fortuitous" rather than "purposeful" in the sense the United States and Texas
supreme courts have employed those concepts. Although his previously-planned trip to pick up
the race car from Classic Jaguar may have fortuitously created a good opportunity to perform the
sale in Texas, Herting nonetheless acted purposefully in opting to do so. In contrast to the
shipowner in Antonio, who had no control over where the ship would port, Antonio, 910 S.W.2d
at 627-28, or Michiana, who had no say over where the RV would end up, Michiana, 168
S.W.3d at 787, there is legally and factually sufficient evidence to support the trial court's
implied findings that Herting had discretion and control over whether he would close the sale in
Texas. As the Texas Supreme Court observed in Michiana, the purposeful-availment concept is
based on implied consent--a nonresident may structure its transactions so as either to invoke the
benefits and protections of Texas laws, thus impliedly consenting to suit there, or to
"purposefully avoid [Texas] by structuring its transactions so as neither to profit from the
forum's laws nor be subject to its jurisdiction." Michiana, 168 S.W.3d at 785. Herting's actions
are much closer to the former than the latter.

 We also cannot agree with appellants' contention that Herting's actions, even if
purposeful, did not constitute availment to the benefits and protections of Texas law. See Moki
Mac, 221 S.W.3d at 576 (observing that "standing alone, delivery of the single RV to Texas to
accommodate Holten was a . . . deficient basis for jurisdiction"). Herting realized a significant
benefit from his actions in Texas: he closed the sale and left with a $35,000 check. He enjoyed
the benefits and protections of Texas law in the process. See Arterbury v. American Bank &
Trust Co., 553 S.W.2d 943, 948-49 (Tex. Civ. App.--Texarkana 1977, no writ) (nonresident
defendant "enjoyed the benefits and protections of the laws of Texas, including the right to resort
to our courts" as its Texas agents repossessed cars here on its behalf); see also Ball, 990 S.W.2d
at 348. These facts stand in contrast to Michiana, where "[e]verything Michiana wanted out of
the contract it had in hand" before the RV ever left Indiana. See Michiana, 168 S.W.3d at 787. 
Nor did Herting evidence any intent to avoid the application of Texas law to his actions in our
capitol city. Cf. id. at 792-93 (discussing forum-selection clauses as proof of intent not to avail
oneself to a forum); Hydrokinetics, Inc. v. Alaska Mechanical, Inc., 700 F.2d 1026, 1029-30
(5th Cir. 1983) (citing an Alaska choice-of-law clause among other factors demonstrating that
defendant did not avail itself to the benefits and protections of Texas law). (26)

 We further observe that while minimum-contacts analysis may often turn on fine
factual distinctions, this does not mean that we apply "mechanical tests." Burger King, 471 U.S.
at 478 (quoting International Shoe, 326 U.S. at 319). Rather, "[i]t is the quality and nature of the
defendant's contacts, rather than their number, that is important." American Type Culture
Collection, 83 S.W.3d at 806. When considering the quality and nature of a defendant's contacts
with Texas, we do not, in other words, lose sight of our ultimate due process inquiry: whether
the assertion of jurisdiction is reasonable in light of the nature of the defendant's actions in the
forum and the state's interests implicated by them. Here, appellants agreed to conduct the entire
sale transaction involving the Jaguar in Texas, and it is not unreasonable or unexpected that they
might be hailed into court here in regard to claims arising from that activity. See Arterbury, 553
S.W.2d at 948-49 (rejecting due-process challenge to assertion of specific jurisdiction over
nonresident defendant based on its agent's acts when repossessing cars in Texas). Appellants'
assertions to the contrary--particularly their theory that Herting was not purposefully availing
himself because he was merely "performing" the sale contract--are ultimately the sort of
"'conceptualistic . . . theories of the place of contracting or of performance'" that we are to
avoid. Burger King, 471 U.S. at 478-79 (quoting Hoopeston Canning Co., 318 U.S. at 316).

 We hold that Herting purposefully availed himself of the benefits and protections
of Texas law when closing the sale of the red Jaguar in Texas. Yet, as Moki Mac demonstrates,
purposeful availment is only one component of specific-jurisdiction minimum contacts analysis. 
"Specific-jurisdiction analysis has two co-equal components. For specific-jurisdiction purposes,
purposeful availment has no jurisdictional relevance unless the defendant's liability arises from
or relates to the forum contacts." Moki Mac, 221 S.W.3d at 579. Appellants argue that even if
Herting's activities in Texas constitute purposeful availment, Ghosh's claims do not arise from
or relate to that contact.


 Relatedness

 To evaluate the "relatedness" prong of specific jurisdiction, we are to examine
whether there is a "substantial connection between those contacts and the operative facts of the
litigation." Id. at 585. Applying that standard, the Texas Supreme Court in Moki Mac looked to
the factual issues that it anticipated would be the primary focus at trial to determine whether the
plaintiffs' misrepresentation claims arose from or related to Moki Mac's purposeful solicitation
of Texas customers:




[T]he operative facts of the Druggs' suit concern principally the guides' conduct
of the hiking expedition and whether they exercised reasonable care in
supervising Andy. The events on the trail and the guides' supervision of the hike
will be the focus of the trial, will consume most if not all of the litigation's
attention, and the overwhelming majority of the evidence will be directed to that
question. Only after thoroughly considering the manner in which the hike was
conducted will the jury be able to assess the Druggs' misrepresentation claim. . .
.Whatever connection there may be between Moki Mac's promotional materials
sent to Texas and the operative facts that led to Andy's death, we do not believe it
is sufficiently direct to meet due-process concerns.




Id. Here, we can evaluate the relatedness of Ghosh's claims to Herting's Texas contacts based
on the record following a jury trial. See Bellair, 819 S.W.2d at 898 (the court must consider the
entire record, "including the evidence adduced at the trial on the merits," when special
appearance rulings are challenged in appeals from final judgments).

 Appellants argue that the operative facts of Ghosh's claims against them relate
primarily to statements they allegedly made outside of Texas, not Herting's acts in Texas. In
fact, Ghosh testified at trial that he decided to purchase the Jaguar in reliance on statements by
Mooney (a third party), Herting's website advertisement, and representations by Herting during
one or more of their telephone conversations. Ghosh did not identify any of the representations
made the basis of his claims as having been made while Herting was in Texas. On appeal,
Ghosh does not contend otherwise, insisting only that his reliance on Herting's representations
occurred in Texas. (27) 

Appellants contend that, for these reasons, the operative facts of Ghosh's claims against them
thereby lack the required substantial relationship to Herting's acts in Texas. We disagree.

 The trial court's judgment against appellants, as noted, was based on the jury's
findings of DTPA "laundry list" violations, unconscionable acts, and knowing conduct. See Tex.
Bus. & Com. Code Ann. §§ 17.46(b); 17.50(a)(1) (West Supp. 2007). In its broad-form "laundry
list" submission, the trial court defined "false, misleading, or deceptive act or practice" to
include not only affirmative misrepresentations, but also the failure to disclose information when
there was a duty to do so. (28) Appellants overlook that Ghosh's DTPA cause of action was not
based solely on affirmative misrepresentations, but on failure to disclose facts when there was a
duty to do so. Although this duty might have arisen from misrepresentations Herting allegedly
made 

from South Dakota, Ghosh's theory also was that Herting violated the DTPA by failing to
disclaim these representations, and instead remaining silent, so as to induce him to proceed with
purchasing the Jaguar without inspecting it. See Kessler v. Fanning, 953 S.W.2d 515, 521-22
(Tex. App.--Fort Worth 1997, no pet.) (holding evidence sufficient to support jury's finding of
DTPA violations because buyers presented some evidence that seller knew, but failed to
disclose, defects in their house). As explained above, even assuming that Ghosh and Herting had
entered into a sale contract by telephone, Ghosh nonetheless had the right to reject the Jaguar
upon tender of delivery in Austin. See Tex. Bus. & Com. Code Ann. §§ 2.508(a), 2.510(a),
2.601, 2.601; S.D. Codified Laws §§ 57A-2-508(1), 57A-2-510(1), 57A-2-601, 57A-2-602. 
Ghosh's allegations that he relied to his detriment on Herting's silence thus encompasses
conduct by Herting while he was physically present in Texas to close the sale. As we have held
that the same conduct by Herting constituted purposeful availment, the required "substantial
connection between those contacts and the operative facts of the litigation" is present. Id. at 585;
cf. Oryx Capital Int'l v. Sage Apts., L.L.C., 167 S.W.3d 432, 441-43 (Tex. App.--San Antonio
2005, no pet.) (out-of-state misrepresentations on which suit was based allegedly occurring after
defendant's in-state contacts with Texas did not arise from or relate to those contacts).

 We also observe that the commission of a tort while physically present in the
forum state has long been recognized as a permissible basis for personal jurisdiction under the
due process clause. See Hess v. Pawloski, 274 U.S. 352, 356-57 (1927) (rejecting due-process
challenge to state implied-consent law authorizing personal jurisdiction over nonresidents for
claims arising from their use of motor vehicles in the state); Arterbury, 553 S.W.2d at 948-49
(rejecting jurisdictional challenge regarding tort claims arising from non-resident defendant's
repossession of automobiles in Texas); but see Michiana, 168 S.W.3d at 788-92 (explaining that
personal jurisdiction does not turn on whether an act is tortious, but on whether the act
constitutes purposeful availment). In terms of the ultimate due-process inquiry, the defendant's
commission of a tort while physically present in the state tends to implicate state interests while
also demonstrating that litigation there would not typically constitute an unwarranted burden on
the defendant. Id. at 799. These principles further support our conclusion that minimum
contacts are present here with regard to appellants' omission tort while purposefully availing
themselves of the Texas forum.

 Additionally, Herting's alleged misrepresentations or failure to disclose was not
the sole focus of the evidence at trial. That focus, as it related to appellants, was threefold: (1)
what appellants knew about the condition of the Jaguar when selling it to Ghosh; (2) what
Herting told Ghosh about the car; and (3) the actual condition of the car when Ghosh drove it
off into the Hill Country. Both Ghosh and appellants devoted considerable attention at trial to
the condition of the Jaguar when sold, focusing on the car's performance on Texas roads, the
results of Texas inspections, and the impact of Ghosh's treatment of the car in Texas during the
months before trial. This is the converse of the trial record the supreme court anticipated in
Moki Mac: a trial primarily centered on disputed issues regarding out-of-state events, without
whose resolution the claims of Texas misrepresentations could not meaningfully be evaluated. 
Moki Mac, 221 S.W.3d at 585. Here, the jury had to address the condition of a car brought into
Texas through Herting's purposeful actions in order to evaluate Herting's liability for acts and
omissions made in and out of state.

 We conclude that there is legally and factually sufficient evidence that appellants
have established minimum contacts with Texas.


 Conclusion regarding personal jurisdiction

 We conclude that the trial court did not err in overruling appellants' special
appearances. We overrule appellants' first through fourth issues.


Choice of law

 In their twenty-sixth point of error, appellants argue that the trial court erred in
applying Texas rather than South Dakota law to Ghosh's claims. Appellants preserved this point
by filing a motion asking the trial court to apply South Dakota law and requesting the trial court
to take judicial notice of the South Dakota law that would govern Ghosh's claims, attaching
copies of the South Dakota Deceptive Trade Practices and Consumer Protection Act and relevant
case law. See Coca-Cola Co. v. Harmar Bottling Co., 218 S.W.3d 671, 695 (Tex. 2006)
(explaining that choice of law issue can be waived unless the complaining party objects to the
law being applied, requests application of another state's law, and requests judicial notice of the
law of the other state); see also Kucel v. Walter E. Heller & Co., 813 F.2d 67, 74 (5th Cir. 1987)
(holding that complaining party is required to "call the applicability of another state's law to the
court's attention in time to be properly considered."). Appellants urged there were several
important differences between South Dakota and Texas law governing Ghosh's claims: under
South Dakota law, (1) only intentional or knowing misrepresentations are actionable; (2) only
actual damages are recoverable; and (3) there is no provision for recovering attorney's fees. See
Compaq Computer Corp. v. Lapray, 135 S.W.3d 657, 672 (Tex. 2004) (in choice-of-law
analysis, "we must first decide whether Texas law conflicts with the laws of other interested
states, as there can be no harm in applying Texas law if there is no conflict.").

 Which state's law governs an issue is a question of law, which we review de
novo. Torrington Co. v. Stutzman, 46 S.W.3d 829, 848 (Tex. 2000); Minnesota Mining & Mfg.
Co. v. Nishika, Ltd., 955 S.W.2d 853, 856 (Tex. 1996). Texas uses the Restatement's "most
significant relationship" test to decide choice-of-law issues. Hughes Wood Prods., Inc. v.
Wagner, 18 S.W.3d 202, 205 (Tex. 2000); Restatement (Second) of Conflict of Laws § 6 (1971). 
Section 6 of the Restatement lists the general considerations we consider in this inquiry:


(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of
those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.


Restatement (Second) of Conflicts of Laws § 6(2). We consider "the qualitative nature of the
particular contacts" with a state, and the "state policies underlying the particular substantive
issues." Duncan v. Cessna Aircraft, Co., 665 S.W.2d 414, 421 (Tex. 1984). Also, in respect to
claims of fraud and misrepresentations, we refer to section 148 of the Restatement:




(2) When the plaintiff's action in reliance took place in whole or in part in a
state other than that where the false representations were made, the forum
will consider such of the following contacts, among others, as may be
present in the particular case in determining the state which, with respect
to the particular issue, has the most significant relationship to the
occurrence and the parties:


 (a) the place, or places, where the plaintiff acted in reliance
upon the defendant's representations,

 (b) the place where the plaintiff received the representations,

 (c) the place where the defendant made the representations,

 (d) the domicil, residence, nationality, place of incorporation
and place of business of the parties,

 (e) the place where a tangible thing which is the subject of the
transaction between the parties was situated at the time, and

 (f) the place where the plaintiff is to render performance under
a contract which he has been induced to enter by the false
representations of the defendant.




Restatement (Second) of Conflict of Laws § 148(2). The Restatement's enumerated contacts are
not to be evaluated quantitatively, but according to their relative importance. Id.

 Evaluating the parties' respective contacts in light of the Restatement's
considerations, South Dakota was the place where: (1) appellants were domiciled, (2) appellants
were located when they made the representations that are the basis for Ghosh's claims, and (3)
the Jaguar was located at certain relevant times. Texas was the place where: (1) Ghosh was
domiciled, (2) Ghosh was located when the representations were made, (3) the Jaguar was
located at certain relevant times, (4) Ghosh relied on the representations, and (5) the sale
transaction, as discussed above, was conducted or performed. Examining the first three factors
listed for both South Dakota and Texas, the relationship of the parties' contacts to each state
appears to be equal. However, it was in Texas that Ghosh relied on appellants' actions and
where the sale was performed. According to the Restatement, the place where one party made
and the other party received misrepresentations are of equal importance, but the place of reliance
outweighs either factor in importance to the choice of law inquiry. Restatement (Second) of
Conflict of Laws § 148(2), cmt. g; Tracker Marine, L.P. v. Ogle, 108 S.W.3d 349, 356 (Tex.
App.--Houston [14th Dist.] 2003, no pet.). Further, the Restatement places more weight on the
plaintiff's domicile than the defendant's "because a financial loss will usually be of greatest
concern to the state with which the person suffering the loss has the closest relationship." 
Restatement (Second) of Conflict of Laws § 148(2), cmt. i; Tracker Marine, L.P., 108 S.W.3d at
356. Considering all the factors relevant to a claim for fraud or misrepresentation and weighing
their relative importance, Texas appears to have a more significant relationship to the issues
involved in this case.

 Furthermore, reviewing the policy concerns enumerated in section 6 of the
Restatement persuades us that Texas law should apply. No specific provision in the Texas
DTPA provides that it is to apply to out-of-state acts affecting Texas consumers; however, the
legislature has mandated that the DTPA be "liberally construed and applied to promote its
underlying purposes, which are to protect consumers against false, misleading, and deceptive
business practices, unconscionable actions, and breaches of warranty." Tex. Bus. & Com. Code
Ann. § 17.44(a) (West 2002). The DTPA's definition of "trade" and "commerce" includes the
sale of any good or service "wherever situated" if the trade or commerce "directly or indirectly
affect[s] the people of this state." Tex. Bus. & Com. Code Ann. § 17.45(6) (West Supp. 2007);
Tracker Marine, L.P., 108 S.W.3d at 355. Recognizing the legislature's intention that the
DTPA be liberally construed to protect Texas consumers, courts generally apply the Texas
DTPA to suits involving damages to Texas consumers, regardless of where the defendant
maintains his business. See, e.g., Tracker Marine, L.P., 108 S.W.3d at 355 (applying Texas
DTPA to suit against Missouri-based corporation); Busse v. Pacific Cattle Feeding Fund No. 1,
Ltd., 896 S.W.2d 807, 814 (Tex. App.--Texarkana 1995, writ denied) (applying Texas DTPA to
suit against Iowa resident).

 We conclude that the trial court did not err in applying Texas rather than South
Dakota law. We overrule appellants' twenty-sixth point of error.


Jury charge

 In their twenty-third through twenty-fifth points of error, appellants complain that
the trial court abused its discretion in refusing to submit various issues and instructions to the
jury.

 Rule 278 of the Texas Rules of Civil Procedure provides that a "court shall
submit the questions, instructions and definitions in the form provided by Rule 277, which are
raised by the written pleadings and evidence." Tex. R. Civ. P. 278. Under Rule 278, the trial
court is required to submit questions to the jury if the pleadings and any evidence support them. 
Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex. 1992); Rosell v. Central W. Motor Stages, Inc., 89
S.W.3d 643, 653 (Tex. App.--Dallas 2002, pet. denied). To determine whether the trial court
should have submitted appellants' issues to the jury, we must examine the record to determine if
the pleadings and legally sufficient evidence support them. Elbaor, 845 S.W.2d at 243; 4901
Main, Inc. v. TAS Auto., Inc., 187 S.W.3d 627, 630-31 (Tex. App.--Houston [14th Dist.] 2006,
no pet.). If, reviewing the evidence in favor of the party against whom the questions were
refused, we find more than a scintilla of evidence supports submission of a valid theory of
recovery, we will reverse. Elbaor, 845 S.W.2d at 243; Rosell v. Central W. Motor Stages, Inc.,
89 S.W.3d 643, 653 (Tex. App.--Dallas 2002, pet. denied).

 A trial court is afforded more discretion when submitting instructions than when
submitting questions. TXI Transp. Co. v. Hughes, 224 S.W.3d 870, 900 (Tex. App.--Fort Worth
2007, pet. filed); Wal-Mart Stores, Inc. v. Middleton, 982 S.W.2d 468, 470 (Tex. App.--San
Antonio 1998, pet. denied). We review a trial court's decision to submit or refuse a particular
instruction under an abuse of discretion standard of review. In re V.L.K., 24 S.W.3d 338, 341
(Tex. 2000). The trial court has broad discretion to determine necessary and proper jury
instructions. Id. A trial court abuses its discretion by acting arbitrarily, unreasonably, or
without consideration of guiding principles. Mercedes-Benz Credit Corp. v. Rhyne, 925 S.W.2d
664, 666 (Tex. 1996); Ganesan v. Vallabhaneni, 96 S.W.3d 345, 350 (Tex. App.--Austin 2002,
pet. denied).

 To determine whether an alleged error in the jury charge is reversible, we
consider the parties' pleadings, the evidence presented at trial, and the jury charge in its entirety. 
Rosell, 89 S.W.3d at 653. We will reverse where the trial court has denied a proper submission
of a valid theory of recovery raised by the pleadings and evidence. Id. Otherwise, we will not
reverse unless we find that an error in the jury charge caused an improper judgment to be
rendered. Tex. R. App. P. 44.1(a)(1); Shupe v. Lingafelter, 192 S.W.3d 577, 579 (Tex. 2006);
Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 723 (Tex. 2003).

 In point of error twenty-four, appellants argue that the trial court should have
submitted a jury question inquiring where the sale contract for the Jaguar was executed. They
urge this is a disputed material fact issue going to both personal jurisdiction and choice of law. 
For reasons we have already explained, the place of execution is immaterial to both issues,
which, in any event, are for the trial court rather than the jury. The trial court did not abuse its
discretion in refusing it.

 In point of error twenty-three, appellants argue that they were entitled to a jury
question and accompanying instructions regarding whether the sale agreement regarding the red
Jaguar was an "as is" contract, which they regard as an affirmative defense to Ghosh's claims. 
To support their assertion that an "as is" contract is a defense to suit under the DTPA, appellants
rely on Prudential v. Jefferson Associates. 896 S.W.2d 156, 161-62 (Tex. 1995).

 We need not address appellants' Prudential argument because their "as is"
question was not properly submitted. Rosell, 89 S.W.3d at 653 (requiring reversal only where
the trial court has denied a proper submission of a valid theory of recovery raised by the
pleadings and evidence). Here, causation was already included in the first jury question
submitted, (29) and an affirmative answer to a separate "as is" question, would have negated a
finding of causation as a matter of law. See Prudential, 896 S.W.2d at 161-62 (holding that, as a
matter of law, a valid "as is" provision negates causation). A question that "presents a contrary
or inconsistent theory from the claim relied upon for recovery" is an inferential rebuttal. 
Diamond Offshore Mgmt. Co. v. Guidry, 171 S.W.3d 840, 844 (Tex. 2005) (citing Select Ins. Co.
v. Boucher, 561 S.W.2d 474, 477 (Tex. 1978)). Inferential rebuttal questions or issues are
properly submitted only in the form of instructions. Tex. R. Civ. P. 277. Because appellants
submitted their "as is" question as an improper inferential rebuttal question rather than as an
appropriate instruction to the liability question submitted by the court without objection, the trial
court did not abuse its discretion in refusing the submission. (30)

 In point of error twenty-five, appellants urge they were entitled to a jury
instruction that "a seller has no duty to disclose facts he does not know and that a seller is not
liable for failing to disclose what he only should have known." As appellees suggest, this
requested instruction regarding duty-to-disclose was subsumed in the trial court's broad-form
DTPA "laundry list" submission. (31) The goal of the charge is to submit to the jury the issues for
decision logically, simply, clearly, fairly, correctly, and completely. Hyundai Motor Co. v.
Rodriguez, 995 S.W.2d 661, 664 (Tex. 1998). Courts should only submit questions, definitions,
and instructions when the submissions will help the jury to understand the meaning and effect of
the law. Houghton v. Port Terminal R.R. Ass'n, 999 S.W.2d 39, 45 (Tex. App.--Houston [14th
Dist.] 1999, no pet.). The trial court's charge need not and should not burden the jury with
surplus instructions, even if the additional instructions are correct statements of the law. See
Acord v. General Motors Corp., 669 S.W.2d 111, 116 (Tex. 1984). Texas courts have treated
surplus instructions to the charge as impermissible comments that tilt or nudge the jury one way
or the other. See Lemos v. Montez, 680 S.W.2d 798, 801 (Tex. 1984); Acord, 669 S.W.2d at 116;
Gulf Coast State Bank v. Emenhiser, 562 S.W.2d 449, 453 (Tex. 1978). We conclude that the
trial court did not abuse its discretion in refusing this instruction. (32)

 We overrule appellants' twenty-third through twenty-fifth points of error.


Evidentiary-sufficiency challenges to jury findings

 In their fifth through twenty-second points of error, appellants challenge the legal
and factual sufficiency of the evidence to support various jury findings. Appellants place
greatest emphasis on points five and six, in which they attack the evidence supporting the jury's
actual damages award. The remaining points concern the jury's liability findings. We have
previously summarized the standards of review governing evidentiary-sufficiency challenges.

 The measure of damages submitted to the jury was "the difference, on January 31,
2003, in Travis County, Texas, between the value of the Jaguar as it was delivered to Ghosh and
the value it would have had had it been as represented." Based on this instruction, the jury found
that the difference in the market value of the car as represented and as delivered was $11,500. 
According to appellants, there was no evidence of the market value of the Jaguar as it was
delivered to Ghosh, and there was no evidence of the market value of car as represented by
Herting.

 Market value is the amount that would be paid in cash by a willing buyer who
desires to buy, but who is not required to buy, to a willing seller who desires to sell, but who
does not need to sell. Taub v. City of Deer Park, 882 S.W.2d 824, 827 (Tex. 1994); Exxon Corp.
v. Middleton, 613 S.W.2d 240, 246 (Tex. 1981); Humes v. Hallmark, 895 S.W.2d 475, 480 (Tex.
App.--Austin 1995, no writ). GJP's agreement to sell and Ghosh's agreement to buy the car as
represented for $35,000 is evidence of what a willing buyer would pay a willing seller for the
car. In other words, the parties' agreement to transfer ownership of the car for $35,000 is
evidence that the car's market value was $35,000 as represented.

 Appellants also argue that no evidence was presented as to the market value of the
Jaguar as delivered. Although no witness directly stated the Jaguar's market value as delivered,
several witnesses testified to, and several documents showed, the cost of repairs required to
make the car driveable, or to restore the car to its condition as represented by Herting. Cost of
repairs is evidence of the difference in fair market value as delivered and as represented. See
Celanese Ltd. v. Chemical Waste Mgmt., Inc., 75 S.W.3d 593, 599 (Tex. App.--Texarkana 2002,
pet. denied) (concluding that "the cost of repair . . . can provide the necessary evidence to
support the jury's finding on change in market value."); Central Freight Lines, Inc. v. Naztec,
Inc., 790 S.W.2d 733, 734-35 (Tex. App.--El Paso 1990, no writ) (explaining that, despite
testimony that damaged units had no value when delivered, where measure of damages was
difference in market value and plaintiff elected to repair damages, evidence of the costs of repair
became relevant and material and therefore admissible, not as proof of an alternative measure of
damages, but as evidence bearing on the difference in market value"); Dunlap v. Mars Plumbing
Supply Co., 504 S.W.2d 917, 919 (Tex. App.--San Antonio 1973, no writ) (finding difference in
market value before and after damage to be equal to cost of repairs).

 Here, the parties offered conflicting evidence of costs of repair. According to
Ghosh, Andy McCreadie, an employee of Classic Jaguar, determined that repairing the cracked
and unsafe engine frames would require removing the engine and gearbox, at a cost of $8,000 to
$10,000. Also according to Ghosh, McCreadie reported that the car was worth only $10,000 to
$12,000 in its current condition. Dan Mooney, by contrast, opined that getting the car back on
the road safely would cost about $5,000; however, this estimate did not include the cost of
rebuilding the engine--which he estimated to be $6,500--and there was disputed evidence
whether such a step might be warranted. Robert Tyrone, appellants' expert, testified that the
cost of repairs to make the car roadworthy would be approximately $12,000.

 This range of evidence of repair costs is legally and factually sufficient to support
implied findings of the red Jaguar's fair market value as delivered that, in turn, would support
the jury's calculation of benefit-of-the-bargain damages. See City of Keller, 168 S.W.3d at 829-30; Cain, 709 S.W.2d at 176.

 In points of error seven through twenty-two, appellants argue that the evidence is
legally and factually insufficient to support the jury's liability findings. Appellants contend only
that the sole evidence of any misrepresentations made by Herting were mere puffery and cannot
support liability.

 Whether a statement is an assertion of material fact or merely one of opinion--or
mere puffery--depends on the circumstances in which a statement is made. Transport Ins. Co.
v. Faircloth, 898 S.W.2d 269, 276 (Tex. 1995). Relevant circumstances include "the statement's
specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's
knowledge, and whether the statement relates to the present or the future." Id. Even an opinion
may be actionable if: (1) it is "intertwined" with "direct representations of present facts;" (2)
"the speaker has knowledge of its falsity;" (3) it is "based on past or present facts;" or (4) the
speaker has "special knowledge of facts that will occur or exist in the future." Trenholm v.
Ratcliff, 646 S.W.2d 927, 930-31 (Tex. 1983). "When a speaker purports to have special
knowledge of the facts, or does have superior knowledge of the facts--for example, when the
facts underlying the opinion are not equally available to both parties--a party may maintain a
fraud action." Paull v. Capital Res. Mgmt., Inc., 987 S.W.2d 214, 219 (Tex. App.--Austin 1999,
pet. denied).

 Examples of representations that can amount to mere puffery or opinion include
claims that an investment is "low risk" and will "produce large revenues for a long time," see
Paull, 987 S.W.2d at 218-19, that a settlement is "top dollar," see Faircloth, 898 S.W.2d at 276,
and that a property is "superb," "super fine," and "one of the finest little properties in the City of
Austin." Prudential, 896 S.W.2d at 163. Likewise, using "broad, and vague, commendatory
language comparing [one's] goods favorably with others, or praising them as good, proper,
sufficient, and the like" amounts to mere sales talk, or puffery, not a statement of material fact. 
W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 109 (5th ed. 1984) (internal
quotation marks and citations omitted).

 Here, by contrast, Herting told Ghosh that he drove the Jaguar regularly, that it
drove "very well," that he had "no problems whatever," that the car was "in fine running order,"
that "it's been very, very reliable," and that it had "strong mechanicals." After Ghosh purchased
the car, an inspection revealed structurally unsafe engine frames, corrosion, and serious engine
problems. In this context, Herting's statements were not mere sales hype; but were in the nature
of factual representations. See Trenholm, 646 S.W.2d at 930-31. Further, as the owner and
restorer of the car, Herting purported to have "special knowledge of the facts" and did "have
superior knowledge of the facts," which were not "equally available to both parties." See Paull,
987 S.W.2d at 219. We overrule appellants' seventh through twenty-second points.


Attorney's fees

 Finally, in their twenty-seventh point of error, appellants argue that the trial court
erred in awarding attorney's fees because the judgment on which the award is predicated is
erroneous. Having overruled each of appellants' points of error challenging the underlying
judgment, we overrule this point as well.


CONCLUSION

 Having overruled each of appellants' points of error, we affirm the district court's
judgment.



 __________________________________________

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Henson

Affirmed

Filed: March 28, 2008
1. "GJP" apparently stands for Gerald Johnson Plastering.
2. Mooney, other Classic Jaguar personnel, and Ghosh had lived in Great Britain before
emigrating to the United States. Their spellings of various words in their written correspondence
in evidence reflected their geographic origins.
3. This work included, according to Ghosh, improvements to the cooling system, suspension,
brakes, electrical system, and interior.
4. Herting, according to Ghosh, added that he regularly drove the Jaguar to car shows and
displayed it there.
5. He also inquired with Mooney regarding other cars Classic Jaguar had for sale.
6. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2007).
7. The jury also found that Mooney and Classic had violated the DTPA and committed fraud,
but that neither had acted knowingly or with malice. The jury also found that GJP, Mooney, and
Classic had each made negligent misrepresentations, but that Ghosh had also acted negligently, and
apportioned responsibility 10% to Mooney, 60% to GJP, 5% to Classic, and 25% to Ghosh.
8. Although finding that appellants had each committed fraud and acted with malice, the jury
awarded zero exemplary damages against them.
9. All defendants filed a joint notice of appeal. Only GJP and Herting filed a brief and
prosecuted this appeal. Accordingly, the appeals of Mooney and Classic Jaguar are dismissed for
want of prosecution. See Tex. R. App. P. 42.3.
10. Points 1-4. Point 25, a complaint of charge error, is related to both appellants'
jurisdictional complaints and its choice-of-law issue.
11. Point 26. Point 25, a charge error complaint, is also related to this contention.
12. Points 23-25.
13. Points 5-22.
14. Point 27.
15. Courts of appeals "have appellate jurisdiction co-extensive with the limits of their
respective districts, which shall extend to all cases of which the District Courts or County Courts
have original or appellate jurisdiction, under such restrictions and regulations as may be prescribed
by law . . . [and] such other jurisdiction, original and appellate, as may be prescribed by law." Tex.
Const. Ann. art. V, § 6(a); see also Tex. Gov't. Code Ann. § 22.220(a) (West 2004) (courts of appeal
have "appellate jurisdiction of all civil cases within [our] district of which the district courts or
county courts have jurisdiction when the amount in controversy or the judgment rendered exceeds
$100, exclusive of interest and costs."). As a general rule, "only final judgments are appealable,"
and interlocutory orders are not. Texas A&M Univ. Sys. v. Koseoglu, 233 S.W.3d 835, 841 (Tex.
2007) (quoting Bally Total Fitness Corp. v. Jackson, 53 S.W.3d 352, 355 (Tex. 2001)). Thus, a
party desiring to challenge an interlocutory order ordinarily must wait until if and when the order
is merged into a final judgment and then raise the issue in its appeal from the final judgment. Id.;
see Lincoln Prop. Co. v. Kondos, 110 S.W.3d 712, 715 (Tex. App.--Dallas 2003, no pet.) (observing
that any interlocutory orders in a case are merged into the final judgment). Our general appellate
jurisdiction under article V, section 6 of the Texas Constitution and government code section 22.220
necessarily encompass the subject matter of any interlocutory orders that are merged into the final
judgments on appeal--unless the legislature has elsewhere provided otherwise. Tex. Const. Ann.
art. V, § 6(a) (our jurisdiction is subject to "such restrictions and regulations as may be prescribed
by law . . . [and] such other jurisdiction, original and appellate, as may be prescribed by law."). We
discern no such intent in section 51.014(a)(7) of the civil practice and remedies code.


 Section 51.014(a) is one of the narrow legislative exceptions to the general rule that
trial court orders cannot be appealed while still interlocutory. Koseoglu, 233 S.W.3d at 841. It is
a grant of appellate jurisdiction we would not otherwise possess to consider the types of
interlocutory orders the statute identifies. Id. at 842. This jurisdictional grant is stated in permissive
terms: "[a] person may appeal from an interlocutory order . . . ." Tex. Civ. Prac. & Rem. Code Ann.
§ 51.014(a) (emphasis added). The legislature did not state that section 51.014(a)(7) is the
exclusive or mandatory means for appealing the types of orders within its scope, nor did it say
anything about limiting our general appellate jurisdiction to consider such orders after they are
merged into final judgments. Based on this text and its jurisprudential context, we cannot conclude
that by its limited grant of jurisdiction to us to consider certain types of otherwise-unappealable
interlocutory orders, the legislature intended correspondingly to limit our subject-matter jurisdiction
over appeals from final judgments. Of course, if an interlocutory appeal is taken, the appellate
rulings may have law-of-the-case implications regarding the same issues in any subsequent appeals,
but this is not a limitation on the appellate court's jurisdiction to consider such issues.
16. Appellants' twenty-fourth issue, attacking the trial court's refusal to submit a jury issue
regarding the place where the parties' sale contract was formed, is premised in part on their view
that our standard of review changes where, as here, an appellant opts to challenge the denial of a
special appearance in its appeal from a final judgment following a jury trial. Specifically, appellants
contend that because our scope of review includes all of the evidence on personal jurisdiction
adduced at trial, as explained below, "[l]ogically, this means that in a jury trial, the factual issues
relevant to the special appearance are to be tried to the jury just as any other factual issue." As
explained below, the place the sale agreement was formed is ultimately immaterial because, even
if we assume it was formed in South Dakota, appellants have purposefully availed themselves to
Texas. We also reject appellants' underlying premise that the procedural posture of this appeal
impacts our standard of review regarding disputed fact issues going to personal jurisdiction. 
Appellants cite no authorities to support this view, which is inconsistent with the Texas Supreme
Court's recent personal-jurisdiction jurisprudence. See Michiana, 168 S.W.3d at 790-91 (rejecting
concept that personal jurisdiction could turn solely on whether or not a contact with the forum state
is tortious, observing that such an approach "confuses the roles of judge and jury by equating the
jurisdictional inquiry with the underlying merits."); see also Moki Mac, 221 S.W.3d at 583 (rejecting
"substantive-relevance" approach to the relatedness requirement of specific jurisdiction because "in
practice it would require a court to delve into the merits to determine whether a jurisdictional fact
is actually a legal cause of the injury."). Instead, determinations of such facts are for the trial court
and, in the absence of express findings of fact and conclusions of law, we are to imply that the trial
court found such facts supported by the evidence as were necessary to support its special-appearance
ruling. BMC Software, 83 S.W.3d at 794-95.
17. There is no indication from the record that the trial court heard additional evidence at the
hearing, and its order denying appellants' challenge recites only that it heard "argument." See
Michiana, 168 S.W.3d at 783-84 (requiring "a specific indication that exhibits or testimony was
presented in open court beyond that filed with the clerk" before presuming that the hearing was
evidentiary). Thus, we do not infer from the absence of a reporter's record from the hearing that the
trial court heard evidence from which findings could be implied in support of the court's ruling. 
See id. at 781-82 ("If all the evidence is filed with the clerk and only arguments by counsel are
presented in open court, the appeal should be decided on the clerk's record alone" rather than also
presuming that evidence supporting the trial court's order was presented at the hearing).
18. See Tex. Bus. & Com. Code Ann. § 2.319(a)(2) (West 1994), §§ 2.401(b), 2.503 (West
Supp. 2007).
19. The court acknowledged that such an allegation would fall within the literal language of
the Texas long-arm statute. Id. at 788.
20. The court additionally offered several policy justifications for this holding. First, the court
posited that "directed-a-tort jurisdiction" inappropriately shifted the focus of specific jurisdiction
from the relationship "among the defendant, the forum and the litigation" to that "among the
plaintiff, the forum and the litigation," and made personal jurisdiction dependent on whether the
plaintiff asserted a tort or contract claim. Id. at 790-91. It added that the theory "confuses the roles
of judge and jury by equating the jurisdictional inquiry with the underlying merits."


If purposeful availment depends on whether a tort was directed toward Texas, then a
nonresident may defeat jurisdiction by proving there was no tort. Personal jurisdiction is a
question of law for the court, even if it requires resolving questions of fact. But what if a
judge and jury could disagree? May a trial judge effectively grant summary judgment in a
local jurisdiction by deciding contested liability facts in favor of the defendant? And if a
jury absolves a defendant of tort liability, is the judgment void because the court never had
jurisdiction of the defendant in the first place?


Business contacts are generally matters of physical fact, while tort liability (especially in
misrepresentation cases) turns on what the parties thought, said, or intended. Far better that judges
should limit their jurisdictional decisions to the former rather than involving themselves in the latter.


Id. at 790-91. The court added that "changes in technology have made reliance on phone calls
obsolete as proof of purposeful availment." Id. at 791. The court reasoned: "While the ubiquity
of 'caller id' may allow nonresidents to know a caller's telephone number, that number no longer
necessarily indicates anything about the caller's location. If jurisdiction can be based on phone
conversations 'directed at' a forum, how does a defendant avail itself of any jurisdiction when it can
never know where the other party has forwarded calls or traveled with a mobile phone?" Id. 
Finally, responding to the dissent, which had emphasized Holten's fraud allegations as a basis for
personal jurisdiction, the court held, "Jurisdiction cannot turn on whether a defendant denies
wrongdoing--as virtually all will. Nor can it turn on whether a plaintiff merely alleges
wrongdoing--as virtually all will. If committing a tort establishes jurisdiction, our colleagues will
have to decide who is correct--and then the Texas jurisdictional rule will be: guilty defendants can
be sued here; innocent ones cannot." Id. Instead, the court explained, the proper focus was whether
a defendant's contacts with Texas are purposeful availment under the analysis it had described, not
whether the contacts were tortious. Id. The supreme court concluded by explicitly disapproving
lower court decisions holding that "specific jurisdiction is necessarily established by allegations or
evidence that a nonresident committed a tort in a telephone call" or that "specific jurisdiction turns
on whether a defendant's contacts were tortious rather than the contacts themselves." Id. at 792.
21. In Michiana, the Texas Supreme Court acknowledged that "certain activities over the
Internet" may constitute the sort of "marketing efforts to Texas in the hope of soliciting sales" that
may render a nonresident subject to suit in Texas for claims arising from those activities. Id. at 785
(citing, as other examples, advertising in telephone directories in Texas cities, see Siskind v. Villa
Found. for Educ., Inc., 642 S.W.2d 434, 436 (Tex. 1982), and operating an office for sales
information and support, see Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 201 (Tex. 1985)
(per curiam). The supreme court cited Reiff v. Roy, 115 S.W.3d 700, 705-06 (Tex. App.--Dallas
2003, pet. denied), to illustrate "Texas law on internet activities." Michiana, 168 S.W.3d at 785. 
Reiff, in turn, applies the sliding-scale approach of Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.
Supp. 1119, 1124 (W.D. Pa. 1997). Reiff, 115 S.W.3d at 705-06; see Experimental Aircraft Ass'n,
Inc. v. Doctor, 76 S.W.3d 496, 507 (Tex. App.--Houston [14th Dist] 2002, no pet.) ("Texas courts
have applied the Zippo "sliding scale" in the same or similar fashion in determining whether Internet
activity permits personal jurisdiction."); see also Mink v. AAAA Dev. LLC, 190 F.3d 333, 336 (5th
Cir. 1999) (adopting the Zippo framework in the Fifth Circuit); see generally Peter D. Marketos &
Jennifer Butler Wells, Personal Jurisdiction Through the Internet in Texas, 41 The Advocate 57
(Winter 2007) (surveying Texas state and federal law on the subject). At one end of the sliding-scale is a "passive" website that merely advertises on the Internet. Mink, 190 F.3d at 336. Such
advertisements, accessible to anyone in the world connected to the Internet, do not constitute
purposeful availment to any particular state. See id. At the other end of the scale are sites through
which the owners do business over the Internet by entering into contracts with forum state residents
by knowingly and repeatedly transmitting computer files over the Internet. Id.; see also Moki Mac,
221 S.W.3d at 578 (citing Moki Mac's "soliciting Texas residents through mass and targeted direct-marketing email campaigns" among other evidence of its purposeful marketing activities to Texas). 
In between are those sites with some interactive elements that enable a visitor to exchange
information with a host computer. See Mink, 190 F.3d at 336. This third, intermediate category
requires an examination of the extent and commercial nature of the interactivity. Id. The relevant
portion of the website is that from which the cause of action is alleged to arise. See Lewis v. Fresne,
252 F.3d 352, 358 (5th Cir. 2001) (noting that for specific jurisdiction, the only relevant portion of
the website is the portion from which the cause of action is alleged to arise).
22. In fact, the portion of the Classic Jaguar website on which Herting's ad was posted,
appellants observe, included similar "for sale" listings from North Carolina, California, Colorado,
Georgia, Australia, Canada, and England; another page featured testimonials from Classic Jaguar
customers in Minnesota and Scotland.
23. In fact, during oral argument before this Court, Ghosh conceded that Texas would not
have personal jurisdiction over appellants if Ghosh had traveled to South Dakota to conclude the
transaction instead of Herting coming to Texas.
24. See infra at p.40.
25. CMMC does not detail the parties' payment arrangements, though it notes that "KLR [the
distributor] quoted the price to Hill Country Cellars in deutch marks, although it would accept
payment in U.S. dollars at the current exchange rate." CMMC, 929 S.W.2d at 436.
26. These factors also distinguish this case from a recent decision of the South Dakota
Supreme Court that appellants have cited post-submission. See Marschke v. Wratislaw, 743 N.W.2d
402 (S.D. 2007). Among other differences, Wratislaw, the seller, never entered South Dakota, and
Marschke, the buyer, paid to have the vehicle transported to South Dakota by a third-party motor
carrier.
27. Ghosh's affidavit in opposition to appellants' special appearances (filed by trial counsel
who later withdrew) does contain the following statement: "In Travis County, Texas, on or about
January 31, 2003, Defendant Herting told me that the vehicle that forms the basis of this suit was
running fine, or words to that effect." At trial, as noted, Ghosh did not testify to any such
representations by Herting in Austin, as opposed to over the phone from South Dakota. Ghosh also
stated in his affidavit that, "The events that form the basis of this lawsuit happened in Travis County,
Texas, specifically at CLASSIC JAGUAR (USA), INC., d/b/a Classic Jaguar at 9916 Hwy. 290
West, Austin, TX on or about January 31, 2003." Ghosh does not suggest that these statements in
his affidavit filed by prior counsel, in light of the trial record, are legally or factually sufficient to
support a finding that Herting, while in Texas, made any of the affirmative representations that are
the basis of his claims.
28. The trial court included the following definitions in its charge:


$ Representing that the car had or would have characteristics that it did not have; or


$ Representing that the car was of a particular quality if it was of another; or


$ Failing to disclose information about the car that was known at the time of the
transaction with the intention to induce Avijit Ghosh into a transaction he otherwise would not
have entered into if the information had been disclosed; or


$ Representing that the car was of a particular standard, quality, or grade, if it is of another;
or


$ Representing that work or services had been performed on, or parts replaced in the car
when the work or services were not performed or the parts replaced.


(Emphasis added). See Tex. Bus. & Com. Code Ann. § 17.46(b)(5), (7), (22), (24).


 The trial court also submitted theories of fraud and negligent misrepresentation, both defined
only as affirmative representations.
29. The first question of the jury charge reads:


Did any of the defendants listed below engage in any false, misleading, or deceptive
act or practice that Avijit Ghosh relied on to his detriment and that was a producing
cause of damages to Avijit Ghosh?


The following instruction was also included:


"Producing cause" means an efficient, exciting, or producing cause that, in a natural
sequence, produced the damages, if any. There may be more than one producing
cause.
30. We also note that the parties never executed a written contract. Under the Uniform
Commercial Code, contracts for the sale of goods worth over $500 must be in writing to be
enforceable. Tex. Bus. & Com. Code § 2.201(a). We further note that, despite their use of "as is"
language in their pleadings, appellants pleaded their issue not as a Prudential "as is" causation issue,
see Prudential, 896 S.W.2d at 161-62, but as issues of waiver, assumption of risk, contributory
negligence, and fraud:


Defendants will further show that Defendant is not a dealer in or a merchant of
automobiles and is not liable in any capacity as a dealer or merchant.


Defendants will further show that the defenses of assumption of risk, contributory
negligence, fraud, and waiver are applicable in this case by virtue of the fact that
Plaintiff agreed to take the automobile "as is," thereby assuming the risk of any
faults in the automobile, that failure to inspect was contributory negligence, that it
is fraud for Plaintiff after having agreed to take the car "as is" to bring this action and
make the allegations Plaintiff makes, and that Plaintiff intentionally waived his rights
to inspect the car in order to get a better price.


Under Prudential, an enforceable "as is" clause negates the element of causation. It is not a theory
of waiver, assumption of risk, contributory negligence, or fraud.
31. Specifically, the submission inquired, "Did any of the defendants listed below engage in
any false, misleading, or deceptive act or practice that Avijit Ghosh relied on to his detriment and
that was a producing cause of damage to Avijit Ghosh?" The jury, as noted previously, was
instructed regarding four forms of false, misleading and deceptive acts or practices, including failure
to disclose information "that was known at the time of the transaction."
32. In fact, the trial court expressed its view during the charge conference that the proposed
instruction "would be a form of nudging for the jury, since that matter is already contained in the
definition of false, misleading or deceptive act or practice."